AO 106 (Rev. 01/09) Application for a Search Warrant

## UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

U.S DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

APR 2 8 2022

JAMIE GIANI, Clerk

By

Deputy Clerk

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   2:22-cm-40 |
| Chime Financial accounts belonging to Christina | ) | |
| MOODY, Ryan PETTY, James SCOTT, Whitney | ) | |
| TONEY, Robert TURNER, and Christina WAYMIRE | ) | |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe property to be searched and give its location):*  **See "Attachment A"**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*  **See "Attachment B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

    ☑ evidence of a crime;

    ☑ contraband, fruits of crime, or other items illegally possessed;

    ☑ property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___18___ U.S.C. § ___1343, et. al___ , and the application is based on these facts:  **See "Affidavit attachment"**

    ☑ Continued on the attached sheet.

    ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Ryan Griffit, DOL Special Agent**
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  **4/28/22**

City and state:  Fort Smith, Arkansas

_____
*Judge's signature*

**Hon. Mark E. Ford, U.S. Magistrate Judge**
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, William Ryan Griffitt, being duly sworn, hereby depose and state:

1.      This affidavit is in support of an application for a warrant, pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to search the records of **Chime Financial** for account details of the Chime Financial accounts belonging to:

Christina **MOODY**,

Ryan **PETTY**,

James **SCOTT**,

Whitney **TONEY**,

Robert **TURNER**, and

Christina **WAYMIRE**,

as set forth in more detail in Attachment A and to seize and search for certain items particularly described in Attachment B.

2.      I am a Senior Special Agent (SA) with the U.S. Department of Labor (USDOL), Office of Inspector General (OIG). I have been a SSA with the USDOL-OIG since 2002. I am currently responsible for conducting criminal investigations of certain criminal statutes contained within Title 18 of the United States Code, including crimes related to fictitious employer schemes, identity theft, fraud through electronic media, bank, wire, and mail fraud, and theft of government funds in general. I am authorized to apply for and execute search warrants and arrest warrants for offenses enumerated in Title 18 of the United States Code. I have participated in and directed investigations involving various types of criminal activity and, because of my training and experience, I am familiar with the tactics, methods, and techniques of committing these various types of fraud-related violations of federal law.

3.      The information in this affidavit is based upon my personal knowledge, as well as information learned from other law enforcement agencies, investigators, witnesses, and documents. The facts set forth in this affidavit are based on my personal knowledge and information from others, including other law enforcement officers involved in this case, through interviews and reviews of related unemployment insurance (UI) documents provided by the Arkansas Department of Workforce Services (ADWS), **Chime Financial** records, as well as other electronic files, emails, and other records and files related to this investigation. Since this affidavit is being submitted for the limited purpose of supporting an application for a search warrant, I have

1

not included each fact known to me concerning this investigation, but I have set forth only those facts necessary to establish probable cause.

4.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1028A (Aggravated Identity Theft), and 18 U.S.C. §§ 1343 & 1349 (Wire Fraud and Conspiracy) have occurred and that there is probable cause to search the property particularly described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## BACKGROUND ON CHIME FINANCIAL

5.     **Chime Financial** is a financial technology company that provides basic mobile banking services at no cost through a smart phone application.  Because **Chime Financial** is not itself a banking institution, it partners with regional banks such as Bancorp Bank and Stride Bank who provide certain support services to **Chime Financial** account holders.  **Chime Financial** is an online banking solution that issues the account holder a Visa Debit Card and a spending account (which is linked to an FDIC insured account at the partner bank) that can be managed entirely from the end-user's smartphone.  Account holders obtain an account by downloading an application onto their smartphone and then registering their information online.

6.     **Chime Financial** is headquartered at 77 Maiden Lane, San Francisco, California 94108, in the Northern District of California.  **Chime Financial** maintains stored data, including detailed account information to include the identities of account holders, deposit and withdrawal records, and details of funds transfers including transfers between Chime accounts, know as "Friend-to-Friend transfers."

## BACKGROUND ON THE UNEMPLOYMENT SYSTEM

7.     The Social Security Act of 1935 initiated the Unemployment Insurance (UI) system, which is operated and managed by each state at the direction of the federal government, specifically, the United States Department of Labor (DOL). The UI system is designed to provide benefits to persons who are out of work due to no fault of their own, and who meet other eligibility requirements of state laws. The Arkansas Department of Workforce Services (ADWS) is the responsible agency for the UI program oversight in Arkansas. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law. It expanded ADWS' ability to aid workers impacted by COVID-19, including workers who are not ordinarily eligible for UI benefits. This was done through new temporary UI programs including: Pandemic Unemployment

Assistance (PUA), Lost Wage Assistance (LWA) and the Federal Pandemic Unemployment Compensation (FPUC).

    8.    ADWS provided CARES Act UI benefits from March 11, 2020 through June 26, 2021. To receive benefits, claimants provided ADWS specific information to establish their eligibility, to include their name, social security number, mailing address, as well as self-certification that they meet one of the COVID-19 related reasons for receiving the corresponding benefit. Beneficiaries were paid from the time they were impacted by the selected COVID-19 related reason in the ADWS online application. On a weekly basis, the claimant then files for weekly payment benefits by certifying that the claimant is unemployed, eligible for benefits and is seeking employment. Once certified, ADWS transferred funds through an interstate wire into the claimants' chosen depository. ADWS authorizes their financial services section to release unemployment compensation funds in the form of either: (a) a state contracted debit card mailed to the applicant; (b) a direct deposit into a pre-paid debit card account; (c) a direct deposit into the claimant's designated bank account; (d) or in rare cases, a check will issue, if requested.

**THE UI FRAUD SCHEME**

    9.    There is probable cause to believe that Christina **MOODY** and others conspired to obtain UI funds by means of identity theft and fraud. **MOODY** filed for UI benefits on behalf of others, knowing the application information provided to ADWS was false, and charged the UI recipient a portion of the benefit amount for performing the service. As described in more detail below, **MOODY**, Ryan **PETTY**, James **SCOTT**, Whitney **TONEY**, Robert **TURNER**, and Christina **WAYMIRE** admitted during interviews with law enforcement that they used **Chime Financial** to receive these unemployment benefit payments through **Chime Financial**, via Stride Bank.

    10.    On, or about, August 15, 2020, **MOODY** and Brandon Davis were stopped by the Greenwood, Arkansas police department for equipment failure on the vehicle. During the traffic stop, **MOODY** consented to a search of her vehicle. Greenwood Police Department located a red spiral notebook in the passenger floorboard. **MOODY** was sitting in the passenger side of the vehicle when the stop was made. As the Greenwood police officer looked through the notebook, he observed numerous names, dates of births, social security number, email addresses with passwords, and home addresses belonging to different individuals.

    11.    Because of the information contained within the notebook, the Greenwood police officer read **MOODY** her Miranda rights. **MOODY** stated she understood her rights and answered

3

questions posed. The Greenwood police asked **MOODY** about the notebook and **MOODY** responded that she assists people in obtaining UI. **MOODY** said she does it for free to assist these individuals in obtaining UI benefits. **MOODY** also identified **Chime Financial** as the recipient account for UI payments for herself and other several claimants.

12.     Law enforcement began investigating the identities found in the notebook seized by Greenwood police and found several unemployment claims associated with the information in the notebook. Law enforcement checked the unemployment claims and determined that PUA, LWA, and FPUC payments issued for various individuals listed in the notebook to include **MOODY, PETTY, SCOTT, TONEY, TURNER,** and **WAYMIRE**. This caused law enforcement to review the banking information associated with these claims.  As a result, law enforcement discovered that **MOODY, PETTY, SCOTT, TONEY, TURNER,** and **WAYMIRE,** all had **Chime Financial** accounts (linked to Stride Bank accounts) receiving unemployment funds from ADWS.

13.     Law enforcement received and reviewed banking information from Stride Bank. Law enforcement further learned from Stride Bank that the names above only had **Chime Financial** deposit accounts, which are not under the control of Stride Bank.  However, Stride Bank indicated they issued Visa Debit cards to these individuals on behalf of **Chime Financial**. Stride Bank asserted that in its limited capacity as the card issuer, it did not have access to certain **Chime** account data such as internet protocol addresses used to access the account, wire transfer recipient data, or detailed Chime-to-Chime account transfer information (which is generically described in Chime accounts as a "Pay Friends Transfer.")  Stride Bank stated **Chime Financial** maintains these specific records.

14.     Law enforcement contacted **Chime Financial** and was provided limited information for accounts related to **MOODY, PETTY, SCOTT, TONEY, TURNER, and WAYMIRE**.  The limited data provided lacked specific details about the "Pay Friends Transfers," to include the recipient of the account transfer, inhibiting law enforcement's ability to know with specificity who each of the above subjects were sending and receiving money from throughout the alleged conspiracy.

## CHRISTINA MOODY

15.     On February 10, 2022, **MOODY** was interviewed by law enforcement.  **MOODY** said she filed unemployment claims for 8-10 individuals that she would meet in person or by

4

phone. **MOODY** claims that she entered into the ADWS portal information provided by the claimant and that she did not make up any of the information. **MOODY** said she filed the unemployment claims on others' behalf because she knew how to use the computer while the claimants did not. **MOODY** added that she may have filed additional weekly attestations on behalf of others to receive additional unemployment money but could only recall doing that for one friend named "Joanne."

16.    **MOODY** initially stated that she only received minimal amounts of money from the unemployment claimants as a "gift" for assisting them with the unemployment claims. **MOODY** said she never had an agreement to be paid for the assistance. These "gifts" came in the form of cash or Chime bank account transfers. However, interviews with other UI recipients contradicted **MOODY's** statements, citing they would have to pay **MOODY** to file the unemployment claims. This fee ranged from $1,500 to more than $2,000. Some also claimed that **MOODY** would open a Chime bank account in their name and the unemployment claim deposits were sent to these accounts.

17.    **MOODY** acknowledged filing a UI claim on her own behalf and believed the information provided to ADWS was correct. As part of her unemployment application, **MOODY** claimed that the work she completed prior to being unemployed was "housekeeping." **MOODY** was asked to provide references for homes cleaned before she was forced to stop work because of the pandemic. **MOODY** responded that she could only recall one person who went by the name "Larie." **MOODY** claimed that she could not recall Larie's last name but worked for her for approximately 3 months and cleaned her house weekly. **MOODY** stated she received between $130 and $140 per week from Larie for each cleaning.

18.    Law enforcement contacted L.E., as described by **MOODY** as "Larie," immediately after **MOODY's** interview. L.E. stated she has known **MOODY** for a few years. L.E. described **MOODY** as a friend, but not someone she communicates with regularly. L.E. stated **MOODY** has never been to her home and **MOODY** has never worked for her in any capacity. L.E. added she has never given **MOODY** money for anything.

19.    As part of the investigation, other unemployment claimants linked to **MOODY** were interviewed. These individuals claimed they were either approached by **MOODY** or introduced to **MOODY** to file an unemployment claim using their personal and identifiable information ("PII"). The information they provided **MOODY** included their dates of birth, social security number, home address, email address and phone number. As discussed in detail below,

5

numerous individuals interviewed verified the unemployment claims filed on his/her behalf by **MOODY** contained false information and that **MOODY** was aware that the information in the application was false.  Individuals interviewed also stated that some of the information found within the claim, such as date the date work stopped because of the pandemic and income total, was not provided by him/her.

20.   Interviews of claimants along with a review of their **Chime Financial** accounts revealed that the Chime accounts were used to receive the fraudulently obtained UI money.  The UI deposits were completed through ACH wire transfers and were coded with identifiers showing that ADWS received the UI claim. Once the UI money had been deposited into these **Chime Financial** accounts, it was either transferred to a "friend" or withdrawn as cash.   These withdrawals and transfers were consistent with the amounts discussed by the co-conspirators as the amount **MOODY** charged them for making application on his/her behalf.

## RYAN PETTY

21.   On July 28, 2020, ADWS received a PUA application for **Ryan PETTY**. This application contained among other things, **PETTY's** PII, including his name, social security number, address, and date of birth, his last employment start date as April 20, 2019, and his COVID impact date as April 2, 2020. Based on the information provided to ADWS, **PETTY** was initially paid $11,203 on or about, August 1, 2020, as back-pay for being unable to work because of the pandemic. The claim filed through the ADWS online portal caused an interstate wire transfer from ADWS into a Chime Financial account ending in 2339. Based on additional weekly attestations to being unemployed, **PETTY** received a total of $24,888.

22.   On May 24, 2021, law enforcement interviewed **PETTY**. **PETTY** stated, in part, that **MOODY** was a friend of the family and had assisted him in filing for an ADWS PUA claim. **PETTY** provided his means of identification, including his name, social security number, and date of birth to **MOODY** for her to file the claim online. **PETTY** admitted that he did not work legitimately in the occupation of "self-employed construction worker" as placed into the ADWS online application portal.  **PETTY** added that **MOODY** was aware that the occupation claimed was false at the time she filed the claim. **PETTY** stated **MOODY** agreed to a fee of $1,500 for assisting him.

23.   A review of **PETTY's Chime Financial** Account revealed other payments from ADWS.  For example, **PETTY's** account received an ADWS payment of $119 on August 10,

2020. The next transaction was a "Pay Friends Transfer" in the amount of $100, but it is unknown at this time to whom he sent this payment.

## JAMES SCOTT

24.     On June 17, 2020, ADWS received a PUA application for **James SCOTT**. This application contained **SCOTT's** PII, including his name, social security number, address, and date of birth, his last employment start date as October 1, 2017 and his COVID impact date as March 12, 2020. Based on the information provided, **SCOTT** was initially paid $8,924 on or about, June 29, 2020, as payment for being unable to work because of the pandemic. By filing the claim through the ADWS online portal, **SCOTT's** claim caused an interstate wire transfer from ADWS into a **Chime Financial** account ending in 7379, with access to a **Chime Financial** bank card. Based on additional weekly attestations to being unemployed, **SCOTT** received a total of $28,380.

25.     On February 1, 2022, **SCOTT** was interviewed by law enforcement. **SCOTT** stated that he did apply for unemployment benefits in June 2020, with **MOODY's** help. **SCOTT** stated that he learned of **MOODY** by "word of mouth." **SCOTT** explained he went to **MOODY's** residence in Van Buren, Arkansas sometime prior to the filing for unemployment benefits and provided **MOODY** with his PII, including his name, date of birth, social security number, email address, telephone number and employment information, all for **MOODY** to file for PUA benefits on his behalf. **SCOTT** stated at **MOODY's** direction, **MOODY** applied for a **Chime Financial** Card (supported through Stride Bank) on **SCOTT's** behalf using his information.

26.     A review of **SCOTT's Chime Financial** Account revealed, as an example, the previously listed payment from ADWS in the amount of $8,924 on June 29, 2020. On the same date, there was a "Pay Friends Transfer" transaction in the amount of $1,000. A review of **MOODY's Chime Financial** Account revealed receiving a "Pay Friends Transfer" deposit on June 29, 2020, in the amount of $1,000, but it is unknown who sent this deposit to **SCOTT**.

## WHITNEY TONEY

27.     On July 26, 2020, ADWS received a PUA application in the name of **Whitney TONEY**. This application contained amongst other things, **TONEY's** PII, including her name, social security number, address, and date of birth, as well as her last employment start date as October 3, 2018 September 1, 2019 and her COVID impact date as March 22, 2020. Based on the information provided, **TONEY** was initially paid $11,441 on or about, August 4, 2020, as back-pay for being unable to work because of the pandemic. By filing the claim through the ADWS online portal, **MOODY** and **TONEY** caused an interstate wire transfer from ADWS into a **Chime**

7

Financial account ending in 0257, with access to a **Chime Financial** bank card. Based on additional weekly attestations to being unemployed, **TONEY** received a total of $25,320.

28.     **TONEY** was interviewed by law enforcement on August 5, 2021. **TONEY** stated that she was self-employed as a "housekeeper" and did "some painting," for various individuals from around August 2019 to approximately March of 2020. According to **TONEY**, she was paid cash to clean the residences. **TONEY** stated she cleaned these residences every two weeks and received cash for her labor. **TONEY** continued that **MOODY** assisted **TONEY** with filing for PUA benefits based on the information that **TONEY** provided to **MOODY**. **TONEY** added that **MOODY** assisted **TONEY** for a fee of 15-percent because **MOODY** said something to the effect, "...that's what waitresses make." As a result, **TONEY** recalled paying **MOODY** around $1,500 for her assistance in filing the unemployment claim. **TONEY** also explained how she paid **MOODY** through Facebook messenger account. **TONEY** continued that **MOODY** wanted the money quickly after **TONEY** received her first benefit payment, which is why **TONEY** used Facebook messenger to pay **MOODY**.

29.     A review of **TONEY's Chime Financial** Account revealed, as an example, the previously listed payment from ADWS in the amount of $11,441 on August 5, 2020. On August 6, 2020, another transfer from TONEY's account in the amount of $1,150 was conducted with the description being "FBPAY Christina Moody." Based on my law enforcement experience, I know that "FBPAY" is a label identifying that a money payment was made through Facebook. The "FBPAY" identifier also appears to be consistent with the Facebook payment to **MOODY** that **TONEY** described during her interview.

### ROBERT TURNER

30.     On or about July 14, 2020, ADWS received a UI claim for **Robert TURNER**. The ADWS UI claim for **TURNER** paid $10,004 on July 20, 2020. This payment went into a Chime account in **TURNER's** name. On July 22, 2020, three separate withdrawals were conducted from **TURNER's** Chime account in the following increments with the following descriptions: "Brandon Davis" ($100), "Pay Friends Transfer" ($1,600), and "U.S. Bank, Van Buren, AR" ($500). When law enforcement interviewed **TURNER**, he claimed that he was introduced to **MOODY** through Davis (**MOODY's** Boyfriend). **TURNER** stated **MOODY** completed the ADWS unemployment application and created the Chime account ending in 6145 in his name.

31.     A review of **TURNER's Chime Financial** Account revealed the previously listed payment from ADWS in the amount of $10,004 on July 20, 2020. On July 21, 2020, multiple

ATM withdrawals were conducted and a "Pay Friends Transfer" in the amount of $1,600 was conducted on July 22, 2020. A review of **MOODY's Chime Financial** Account revealed receiving a "Pay Friends Transfer" deposit on July 22, 2020, in the amount of $1,600, but it is unknown if this deposit was from **TURNER's** account.

## CHRISTINA WAYMIRE

32.     On July 5, 2020, ADWS received a PUA application in the name of **Christina WAYMIRE**. This application contained **WAYMIRE's** PII, including her name, social security number, address, and date of birth, as well as her last employment start date as October 18, 2018, and her COVID impact date as March 19, 2020. Based on the information provided, **WAYMIRE** was initially paid $10,123 on or about, July 12, 2020, as back-pay for being unable to work because of the pandemic. By filing the claim through the ADWS online portal, **MOODY** and **WAYMIRE** caused an interstate wire transfer from ADWS into a Chime Financial account ending in 4676, with access to a **Chime Financial** bank card. Based on additional weekly attestations to being unemployed, **WAYMIRE** received a total of $27,516.

33.     On February 10, 2022, **WAYMIRE** was interviewed by law enforcement. **WAYMIRE** stated, in part, that **RICHARDSON, MOODY** and Davis came to her about filing for unemployment. **WAYMIRE** stated that she provided **MOODY** her PII and email address and password to email. **WAYMIRE** added that **MOODY** created a **Chime Financial** account and had a bankcard issued for her. **WAYMIRE** was asked about the information on the unemployment claim pertaining to her income and previous employment as "housekeeping." In response, **WAYMIRE**, stated these were false entries and made up by either **RICHARDSON** or **MOODY**. **WAYMIRE** explained that **RICHARDSON** and **MOODY** were "out recruiting" individuals to file for unemployment. **WAYMIRE** initially stated there was not a financial agreement for **MOODY** to file the application but recalled later that **RICHARDSON** informed her that **MOODY** and Davis "won't want very much for setting it up" (in reference to the unemployment claim.) **WAYMIRE** further explained **RICHARDSON** told her he would handle the additional weekly attestations for continued funds from ADWS and she believes **MOODY** called ADWS every week regarding **WAYMIRE's** account. **WAYMIRE** stated that any transfers from her Chime card to other individuals was not done by her and that **RICHARDSON** and **MOODY** had her account information.

34.     A review of **WAYMIRE's Chime Financial** Account revealed, as an example, the previously listed payment from ADWS in the amount of $10,123 on July 13, 2020. On July 14,

9

2020, a "Pay Friends Transfer" in the amount of $2,000 was conducted.  A review of **MOODY's Chime Financial** Account revealed receiving a "Pay Friends Transfer" deposit on July 14, 2020, in the amount of $2,000, but it is unknown if this deposit was from **WAYMIRE's** account.

## CONCLUSION

35.     Based upon the foregoing, probable cause exists to believe evidence of violations of 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1028A (Aggravated Identity Theft), and 18 U.S.C. §§ 1343 & 1349 (Wire Fraud & Conspiracy) will be found at the property listed in Attachment A. The search and seizure will be for the items listed in Attachment B.

Respectfully submitted,

William Ryan Griffitt
Senior Special Agent
U.S. Department of Labor – Office of
Inspector General

Subscribed and sworn to me by phone and other reliable electronic means this _28_ day of April, 2022.

Honorable Mark E. Ford
United States Magistrate Judge

**Attachment A**

## PROPERTY TO BE SEARCHED

This warrant applies to information associated with the following **Chime Financial** electronic individual/financial accounts:

| Account Holder | Account Numbers |
|---|---|
| Christina **MOODY** | ********1394 <br> *******0397 |
| Ryan **PETTY** | *******2339 |
| James **SCOTT** | ********7379 |
| Whitney **TONEY** | ********0257 |
| Robert **TURNER** | ********6145 |
| Christina **WAYMIRE** | ********4676 |

The information being sought is stored at the premises owned, maintained, or operated by **Chime Financial**.

11

## Attachment B

## PARTICULAR ITEMS TO BE SEARCHED FOR AND SEIZED

1.     Evidence, instruments, and fruits concerning violations of 18 U.S.C. § 641 (Theft of Government Funds), 18 U.S.C. § 1028A (Aggravated Identity Theft), and 18 U.S.C. §§ 1343 & 1349 (Wire Fraud and Conspiracy), for the period, March 1, 2020, to the present date, whether in digital, electronic, or other form.

2.     To the extent that the information described in **Attachment A** ("Location to Be Searched") is within the possession, custody, or control of **Chime Financial,** including any emails, records, files, logs, shared folders, sub-folders, fund transfers, dates of transactions, descriptions of transactions (with full identities, friends' names, addresses, accounts, etc.), amounts, type of transaction, full "PAN" numbers, full account profiles, full card numbers, and/or information that has been deleted but still available to **Chime Financial,** or that may have been preserved pursuant to any request made under 18 U.S.C. § 2703(f), **Chime Financial** is required to disclose the following information to the Government for the electronic individual accounts listed in **Attachment A:**

      a.  Identity of responsible party/customer (names, account number, account holder, billing address, mailing addresses, etc.) to include signature cards, business name(s) and responsible person(s), service timeframes; all accounts in which these individuals had signatory authority and/or the right of withdrawal.

      b.  Points of contact for customer (e.g. name, telephone, email, address(es), etc.);

      c.  All records pertaining to any individual associated with the account whether held jointly or severally or as trustee or fiduciary as well as custodian, executor or guardian as well as any other entity in which this individual may have a financial interest.

      d.  All records reflecting customer's applications for credit/account, dates of issuance and service, credit file or credit data used to obtain service either provided by the customer or gained by your financial institution through normal business practices, and location of any additional points of contacts (e.g., additional card/account holders, residences, apartments, or other business locations associated); All of the same records reflecting location of all account holders associated with the company

12

and/or person listed above (e.g., residence, apartment, other business location, billing history, account history) or within records produced by you;

e.  All documents; records; communications; correspondence; electronic files; diaries; envelopes; labels; notes; e-mails; address, contact, or mailing lists; messages; instant messages; chats; Internet history; records of Internet activity; Internet Protocol addresses; cookies; timestamps; text message logs, instant message logs, and other logs; user profiles; registry information; configuration files; visual depictions; audio recordings or files; and other data or metadata, including GPS tracking data.

f.  All charging, billing, payment, account receivable records for the above listed addresses, companies, and/or person listed above or within records produced to include, but not limited to, payment information (date, amount, payment type), IP addresses, pay friends transfers (full details – including names, account numbers, dates, IP, and amounts), card to card transfer information (full details – including names, account numbers, dates, IP, and amounts), full card number and full replacement numbers (if any), credit card information for payments (full number, name, address, etc.), cancelled check copies (showing name, address, check account number, bank information (name, address, routing number), number on check, amount, etc;)

g.  Debit cards, credit cards, stored value cards, documents, records or correspondence that may relate in any way to the possession or use of any prepaid debit or credit cards, or related to any prepaid debit or credit card provider; documents, records or correspondence from, to, or about, any identity check service or provider, any personal information provider, or any credit check service or provider; documents, records or correspondence regarding the disbursement of monies to co-conspirators or otherwise, of unemployment monies, U.S. Treasury monies, or monies from any other state or federal program; any documents or records reflecting personally identifiable information, including names, social security numbers, dates of birth, driver's license numbers, credit card numbers, IRS Forms 1099, and state and federal employment tax records and bank account information ("PII"), how or where PII was used, or where PII was acquired, and all items or documents that when used alone or in combination with another, can establish an identity.

13

h.  All receipts for withdrawals from accounts at financial institutions, reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, checks deposited, withdrawal slips, cashier's checks, money orders, wire transfers, and any checks issued for withdrawals. This also includes records of money transfers or other disbursements of funds, as well as financial account information, statements, receipts for financial instruments, or other financial records that could contain evidence related to these money transfers or disbursements of funds.

i.  Accounts with any Internet service or online data storage providers, cell phone providers, websites, online groups, or online services; passwords, usernames or other identifiers associated with these accounts; and credit/debit card account and other payment information. This warrant authorizes the identification of such accounts (including identifiers and payment methods as listed).

j.  Records evidencing the use of the Internet Protocol logs captured by the device, including records of Internet Protocol addresses used.

k.  Contextual information necessary to understand the evidence described in this attachment.

l.  All savings account records, including signature cards, ledger cards or records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, checks deposited, withdrawal slips, checks issued for withdrawals, and Forms 1099 issued. Include the front and back of all checks.

m.  All checking account records, including signature cards, bank statements, deposit slips, checks deposited, checks drawn on the account, records pertaining to all debit and credit memos, and Forms 1099 issued. Include the front and back of all checks.

n.  All credit card records, including customer's application, signature card, credit or background investigations conducted, correspondence, monthly billing statements, individual charge invoices, repayment records disclosing the dates, amounts and method (cash or check) of repayment, checks used to make repayments (front and back). Include the front and back of all checks.

o.  Records of certified checks, wire transfers, or collections, letters of credit. Such records that disclose the date and amount of the transaction, method (cash or check)

14

and source of payment, instruments and statements of transactions. Include the front and back of all checks received or issued.

p.  All IP Addresses captured for each account, including IPv4 and IPv6 data with timestamps for each.

q.  All correspondence with the accounts and/or with third parties regarding the accounts. All memoranda, notes, files, or records relating to meetings or conversations concerning the above person. All recorded communications with customer (company and/or person communicating on behalf of company) to include, but not limited to, voice recordings, emails, written letters, notes, etc.

r.  Any video surveillance or employee notes related to the foregoing.